**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| Christina Van Allen, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Fermented Sciences, Inc., | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1.     Fermented Sciences, Inc. ("Defendant") manufactures, labels, markets, and sells "Hard Seltzer" and "Hard Kombucha," promoted as containing "Antioxidant Vit[amin] C," "Antioxidants," "Real Botanicals," and "Crafted With Live Probiotics," among other attributes, under the Flying Embers brand ("Products").





## I.  "BETTER FOR YOU" ALCOHOLIC BEVERAGES

2.   The past decade has seen the emergence of new alcoholic beverages, such as hard seltzer and kombucha.

3.   Hard seltzer is marketed to consumers "at the nexus of convenience and health."

4.   Hard seltzer is based on carbonated water, made from malted barley, or fermented sugar, fruit flavored, with a low alcohol content, and roughly 100 calories or less, compared with beers and wines that have between 100 to 400 calories.

5.   Hard kombucha has its roots in regular kombucha, a fermented drink made with sweetened black or green tea and bacteria, often blended with fruit juice.

6.   Kombucha is touted for its probiotic properties, believed to promote digestive health.

7.   Hard kombucha, which is alcoholic, benefits "from the halo effect of these perceived health benefits."

8.   Hard kombucha and hard seltzer are typically low in calories, sugar, and carbohydrates, organic, non-GMO and gluten-free.

9.   These products are sold in similar single-serve aluminum cans.

10.   The marketing of hard seltzer and hard kombucha reflect the arc of regular beverages, which previously sought to remove negative ingredients, such as sugar and artificial colors.

2

11.   However, these beverages have begun to add back positive components, like vitamins and probiotics.

12.   The front labels of Defendant's hard seltzer and hard kombucha emphasize "Antioxidant Vit[amin] C" and "Live Probiotics."



13.   The front label of the Hard Kombucha Products states, "Fermented With Botanical Adaptogens," and "Live Probiotic[s]," while the back label lists other attributes and components.

 

Live Probiotics
Antioxidants
USDA Organic
Adaptogens
Gluten Free
Non-GMO
Vegan
Keto

14.    The promotional materials for the Hard Kombucha Products describe them as "Brewed With Benefits," with a list of their features.



Light and Live

0 Sugar 85 Calories 0 Carbs

ALC 4.5% VOL

Brewed With Benefits
Always Live • Never Pasteurized

USDA Organic
Probiotics
Antioxidants
Adaptogens
Botanicals
Gluten Free
Vegan
Keto

Contains Alcohol 21+ Please Drink Responsibly

4

15.     The ingredients in the Hard Seltzer and Hard Kombucha Products are shown below.

Hard Seltzer

Hard Kombucha

**INGREDIENTS:** SPARKLING WATER, ALCOHOL FROM CANE SUGAR*, PINEAPPLE FLAVOR*, CAYENNE*†, ACEROLA JUICE POWDER*, MALIC ACID*, CITRIC ACID*, BACILLUS COAGULANS SNZ 1969 PROBIOTIC*.

**INGREDIENTS:** KOMBUCHA CULTURE [WATER, SUGAR*, BLACK TEA*, YEAST, BACTERIA (KOMAGATAIEBACTER SPPS., BACILLUS COAGULANS SNZ 1969 PROBIOTIC CULTURE)], ACEROLA JUICE POWDER*, ADAPTOGEN ROOT BLEND (GINGER*, TURMERIC*, GINSENG*), ELDERBERRY*†, STRAWBERRY*†, CHERRY*†, RASPBERRY*†, GOJI*†.

16.     Hard seltzer and hard kombucha are markets with over a hundred brands, which forces companies to compete for consumer dollars.

17.     To succeed, the products must stand out from the crowd with something different.

A.   Consumption of Alcohol is Contrary to Dietary Guidelines

18.     In 2004, the National Institute on Alcohol Abuse and Alcoholism (NIAAA) wrote:

> Alcoholic beverages primarily consist of water, pure alcohol (chemically known as ethanol [ethyl alcohol]), and variable amounts of sugars (i.e., carbohydrates); their content of other nutrients (e.g., protein, vitamins, or minerals) is usually negligible.

19.    Ethyl alcohol contains seven calories per gram, which means alcoholic beverages are almost entirely empty calories.

20.    The USDA 2020-2025 Dietary Guidelines for Americans ("DGA") advises that "[a]lcoholic beverages are not a component of the USDA Dietary Patterns."

21.    The DGA advises that, for "[a]dults who choose to drink…to limit daily intakes…so as not to exceed daily calorie limits," and "[d]rinking less is better for health than drinking more."

22.    However, alcoholic beverages account for the additional calories consumed *after* "meeting food group recommendations in nutrient-dense forms."

B.    Harmful Effects of Alcohol Consumption

23.    Congress concluded that "the American public should be informed about the health hazards that may result from the consumption or abuse of alcoholic beverages," and requires the following statement on these products:

> GOVERNMENT WARNING: (1) According to the Surgeon General, women should not drink alcoholic beverages during pregnancy because of the risk of birth defects. (2) Consumption of alcoholic beverages impairs your ability to drive a car or operate machinery, and **may cause health problems**.

> 27 U.S.C. § 215 (emphasis added).

24.    Evidence suggests that even drinking *within* recommended limits may increase the overall risk of death from various causes, such as from several types of cancer and some forms of cardiovascular disease.

25.    Over many years, consumption of excess alcohol can impair the body's ability to

digest and utilize nutrients.

26.     According to the CDC, "[m]ore than 140,000 people die from excessive alcohol use in the U.S. each year," equal to "more than 380 deaths per day."

27.     These deaths shorten the lives of those who die by an average of 26 years, for a total of 3.6 million years of potential life lost.

28.     The cost of excessive alcohol consumption is over a quarter trillion dollars per year.

29.     More than half of alcohol-attributable deaths are due to health effects from drinking too much over time, such as various types of cancer, liver disease, and heart disease.

## II.     ADDITION OF ANTIOXIDANTS, PROBIOTICS, AND ADAPTOGENS TO ALCOHOL IS MISLEADING

30.     Federal and identical state regulations require the statements on food and beverages to be truthful and non-misleading. *See* 21 U.S.C. § 343(a)(1) and Fla. Stat. § 500.11 (deeming a food misbranded when it contains a statement that is "false or misleading in any particular").

31.     Thus, a violation of federal food labeling laws is an independent violation of Florida law and actionable as such.

32.     The Florida Deceptive and Unfair Trade Practices Act provides protection for consumers purchasing items like the Products, and states, "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Fla. Stat. § 501.204(1).

33.     The DGA encourage consumers to select "healthful sources of nutrients as part of a well-rounded diet" instead of meeting vitamin-intake guidelines through consumption of otherwise nutritionally-harmful foods and beverages.

34.     The Products are fortified with antioxidants, probiotics, and adaptogens, contrary to FDA requirements for the addition of nutrients and components to food.

35.     These requirements are intended to prohibit random fortification of foods, which "result[s] in deceptive or misleading claims." 21 C.F.R. § 104.20(a).

36.     In a 2015 Q&A Guidance Document relating to the Fortification Policy, the FDA stated they did not consider "it appropriate to add vitamins and minerals to alcoholic beverages."

37.     According to the non-profit group Center for Science in the Public Interest ("CSPI"), "claims such as 'made with antioxidant vitamin C' convey healthfulness and are misleading on alcoholic beverages given their empty calories, association with serious health conditions, and anti-nutrient properties."

38.     Studies have shown that vitamin-fortified snack foods influence consumers to make negative diet-related decisions by making them less likely to look at the nutrition facts, more likely to purchase the fortified product, more likely to think the fortified product is healthier than a comparable nonfortified product, and more likely to incorrectly identify the fortified product as the healthier product.

39.     Fortification of carbonated beverages is prohibited because this type of product is typically (1) high in sugar and/or empty calories, (2) not nutrient-dense, and (3) not intended to be a significant part of a balanced diet.

A.  <u>Antioxidants</u>

40.     Antioxidants are compounds which may prevent or delay cell damage, and include vitamins C and E, selenium, beta-carotene, lycopene, lutein, and zeaxanthin.

41.     The antioxidant claims give the impression the Products are a healthful and nutritious source of vitamin C.

1.  <u>Fortification with Antioxidants is Inconsistent with Regulations and Misleading</u>

42.     The addition of acerola in the Products is fortification because this ingredient is used

to add Vitamin C, instead of to provide cherry juice.

43.     The addition of vitamin C is not appropriately added to the Products because there is not a dietary insufficiency caused by a lack of vitamin C that is recognized by the scientific community to exist or known to result in a nutritional deficiency disease. 21 C.F.R. § 104.20(b).

44.     According to the National Institutes of Health, vitamin C deficiency is rare, and the average American exceeds the RDI for vitamin C.

45.     Vitamin C is water soluble, and any excess is not stored in the body, such that *more* vitamin C will pass through the body.

46.     Alcohol consumption interferes with nutrient absorption, and even where a body absorbs nutrients, alcohol prevents the body from using nutrients by altering the transport, metabolism, and storage of nutrients.

47.     Consumption of alcoholic beverages reduces levels of antioxidants, like vitamin C, in the body.[1]

48.     The addition of vitamin C to the Products is prohibited because it is not added in proportion to the caloric content, because the Products contain between 85 and 135 calories, yet 20% of the daily value for vitamin C, based on 2,000 calories per day. 21 C.F.R. § 104.20(d).

49.     The addition of vitamin C to the Products is prohibited because they do not contain all the required nutrients per 100 calories based on 2,000 calories per day. 21 C.F.R. § 104.20(d).

50.     For instance, the Products have no protein. 21 C.F.R. § 104.20(d)(3)

51.     The addition of vitamin C to the Products is prohibited because even though vitamin C is generally recognized as safe ("GRAS") under the food additive regulations, upon information

---

[1] Defeng Wu and Arthur I. Cederbaum. "Alcohol, Oxidative Stress, and Free Radical Damage;" Hartman et al. "Moderate alcohol consumption and levels of antioxidant vitamins and isoprostanes in postmenopausal women."

and belief, no GRAS notification has been submitted with respect to its addition to alcoholic beverages. 21 C.F.R. § 104.20(g); 21 C.F.R. § 182.3013, 182.8013.

52.     The addition of vitamin C to the Products is prohibited because it is not bio-available when consumed via an alcohol beverage. 21 C.F.R. § 104.20(g)(2).

   2.   Negative Effects of Consuming Alcoholic Beverage Outweigh Positive Effects from Vitamin C

53.     Even though the Products contain twenty percent of the daily value of vitamin C, it is necessary to consume an alcoholic beverage to get this amount. *See* 21 C.F.R. § 101.9(c)(8).

54.     The emphasis on "antioxidant Vit C" suggests the Products are "a healthful source of nutrients, obscuring the fact that alcoholic beverages provide empty calories, are associated with serious health conditions, and can impair the body's metabolism of nutrients," like vitamin C.[2]

55.     Advertising health benefits of the Products through the addition of antioxidants caused consumers, like Plaintiff, to misconstrue the negative effects of even moderate amounts of alcohol consumption, in violation of 21 C.F.R. § 101.65(d).

56.     Current scientific research indicates that 20% of the daily value of vitamin C cannot provide health benefits which overcome the negative effects of one alcoholic beverage.

57.     Scientific research suggests that isolated antioxidants, such as vitamin C, do not provide the same health benefits as antioxidants from a diet rich in fruits and vegetables.

58.     Clinical studies show that vitamin C, consumed alone, lacks the same positive effects when it is consumed as part of a diet rich in fruits and vegetables.

59.     Through observing the Products' labeling, Plaintiff eschewed consumption of foods which were natural sources of vitamin C.

---

[2] CSPI, Vizzy Enforcement Letter, Mar. 15, 2021.

B.  Probiotics

60.    The claims that the Products contain "live probiotics" are misleading nutrient content claims.

61.    Congress required that the FDA develop and implement nutrient content claims to prevent consumers from being misled by the endless terms and descriptors appearing on foods.

62.    Nutrient content claims tell consumers about the level of relevant nutrients in a food.

63.    The criteria for nutrient content claims were the result of dozens of meetings held by the FDA with consumers.

64.    "Expressed" nutrient content claims are direct statements about the level (or range) of nutrients in a food, e.g., "low sodium" or "contains 100 calories." 21 C.F.R. § 101.13(b)(1).

65.    "Implied" nutrient content claims can describe the food or an ingredient in a manner that suggests that a nutrient is absent or present in a certain amount. 21 C.F.R. § 101.13(b)(2).

66.    For example, a claim that a food is "high in oat bran" is understood as a way of saying that food is high in fiber. 21 C.F.R. § 101.13(b)(2)(i).

67.    Implied nutrient content claims can also suggest that a food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is made in association with an explicit claim or statement about a nutrient e.g., "healthy, contains 3 grams (g) of fat." 21 C.F.R. § 101.13(b)(2)(ii).

68.    Nutrient content claims are restricted to nutrients that have an established Reference Daily Intake ("RDI") or Daily Reference Value ("DRV").

69.    If this were not the case, companies would be able to promote nutrients and ingredients which were of limited or no value, and consumers would not be able to know if those statements were truthful and meaningful.

70.    Probiotics are not recognized by FDA as having an RDI or DRV.

71.     Probiotics are defined by the Food and Agriculture Organization and the World Health Organization as "live microorganisms which when administered in adequate amounts confer a health benefit on the host."

72.     Consumer enthusiasm for probiotics is based on the unregulated messages conveyed by companies which sell these products, which is a multibillion-dollar industry.

73.     Most studies on probiotic strains – including those identified in the Products, reveal no benefit to persons who are already healthy.

74.     The only people who *may* benefit from probiotics are those who suffer from a small number of intestinal disorders.

75.     Experts have warned that healthy people who consume probiotics may suffer harm.

76.     According to Dr. Matthew Ciorba, a gastroenterologist at Washington University in St. Louis, "There is no evidence to suggest that people with normal gastrointestinal tracts can benefit from taking probiotics."

77.     The theory behind probiotics is based on the consumption of live bacteria, which will survive and propagate in the intestinal tract, altering the internal composition of the human body.

78.     However, the human gut contains tens of trillions of bacteria.

79.     Any amount of probiotics in the Products is "still just a drop in a bucket," because "The gut always has orders of magnitude more microbes," states Shira Doron, an infectious disease expert at Tufts Medical Center.

80.     Defendant touts the "live probiotics" of the Products.

81.     Even outside of the context of alcoholic beverages, the promotion of a food or beverage as containing probiotics would be misleading.

82.     However, where the products are alcoholic beverages, the promotion of probiotics is

highly deceptive.

83.    The word "probiotic" consists of "pro," which means "to support" and "biotic," which relates to life.

84.    However, consumption of alcohol, even in modest amounts, has been proven to have a detrimental effect on life expectancy and quality of life.

85.    The promotion of "live probiotics" is also misleading because there is no recognized or accepted number, amount or colony forming units ("CFU") of probiotics with which the amount and/or type of probiotics in the Products can be compared.

C.   Adaptogens

86.    Adaptogens is a new word for botanical ingredients believed to have health benefits.

87.    By promoting the Products as containing adaptogens, Defendant is telling consumers the Products will have unspecified salutary effects.

88.    The adaptogen representations are misleading because the ingredients in the Products which qualify as adaptogens are not associated with providing any salutary effects.

89.    All competent scientific studies of the adaptogens in the Products confirmed that they were incapable of providing the positive effects expected.

90.    Adaptogens may also be harmful.

91.    Even if adaptogens provided any health benefit, this would be outweighed by the negative effects from consuming one alcoholic beverage.

III.   CONCLUSION

92.    A reasonable consumer would expect that the Products are a healthful source of nutrients and dietary ingredients, such that these additions outweigh any negative effects otherwise associated with alcohol consumption.

93. Consumers do not expect that products contain labeling which expressly violates the policies and regulations of this state and nation.

94. Consumers figure that by the time a product gets to the shelves, the companies have "serious people" and "fancy lawyers" who "sign off" on the legitimacy of their labeling.

95. Thus, there is an implicit acceptance that what they are presented with is truthful, accurate, and in their best interest.

96. Consumers would not know that the Products are unlawfully fortified and labeled in the precise way which was supposed to have been prevented.

97. This knowledge would require investigation beyond the store aisle, which is outside of what the average consumer can be expected to know.

98. An average consumer does not have the specialized knowledge necessary to ascertain that the deleterious effects of alcohol overtime will not be overcome by the addition of vitamin C and probiotics.

99. Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

100. By labeling the Products in this manner, Defendant gained an advantage against other companies, and against consumers seeking to purchase products which contained ingredients whose positive effects outweighed the negative effects from consuming alcohol.

101. The value of the Products that Plaintiff purchased was materially less than their value as represented by Defendant.

102. Defendant sold more of the Products and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

103.   Had Plaintiff and proposed class members known the truth, they would not have bought the Products or would have paid less for them.

104.   The Products are sold for a price premium compared to other similar products, no less than approximately $16.49 for a six-pack of 12 oz cans, a higher price than they would otherwise be sold for, absent the misleading representations and omissions.

105.   Similar products which do not contain the misleading representations are sold for a lower price of approximately $10.49 for a six-pack of 12 oz cans.

<u>Jurisdiction and Venue</u>

106.   Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

107.   The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

108.   Plaintiff Christina Van Allen is a citizen of Florida.

109.   Defendant Fermented Sciences, Inc. is a California corporation with a principal place of business in Ventura, California, Ventura County.

110.   The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

111.   The members of the class Plaintiff seeks to represent are more than 100, because the Products have been sold with the representations described here for several years, in hundreds of locations across the States covered by Plaintiff's proposed classes.

112.   Defendant transacts business within this District, through the marketing, supply, and sales of its products at thousands of stores within this District and sold online to citizens of this District.

113.   Venue is in this District because Plaintiff resides in this District and the actions giving rise to the claims occurred within this District.

114.   Venue is in the Tampa Division of this District because a substantial part of the events or omissions giving rise to the claim occurred in Hillsborough County, i.e., Plaintiff's purchase and consumption of the Products and her awareness of the issues described here.

Parties

115.   Plaintiff Christina Van Allen is a citizen of Lutz, Hillsborough County, Florida.

116.   Plaintiff likes fruits and vegetables and eating healthy.

117.   Plaintiff also likes moderate consumption of alcoholic beverages on occasion.

118.   Plaintiff knows consuming alcohol isn't the best thing, but the promotion of antioxidants, probiotics, and adaptogens alleviates any guilt she has from consuming the Products.

119.   Defendant Fermented Sciences, Inc. is a California corporation with a principal place of business in Ventura, Ventura County, California.

120.   Defendant is a leader in the area of better-for-you alcoholic beverages.

121.   Defendant rides the coattails of kombucha, a beverage which is naturally healthy, to promote hard kombucha with added vitamins and probiotics.

122.   Defendant's owners have an impressive history selling kombucha.

123.   These facts show a company with a significant amount of goodwill and equity when it comes to consumer purchasing.

124.   The Products are sold at tens of thousands of retail locations such as gas stations, convenience stores, grocery stores, specialty markets, big box stores, warehouse clubs, and online, in the States covered by the classes Plaintiff seeks to represent.

125.   Plaintiff purchased the Products on one or more occasions within the statutes of

limitations for each cause of action alleged, from stores including ABC Fine Wine & Spirits, 3015 W Kennedy Blvd, Tampa, FL 33609, between September 2020 and February 2022, among other times.

126.   Plaintiff bought the Products because she expected they contained ingredients whose positive effects outweighed the negative effects from consuming alcohol because that is what the representations said and implied.

127.   Plaintiff relied on the words and images on the labels, identified here.

128.   Plaintiff bought the Products at or exceeding the above-referenced price.

129.   Plaintiff would not have purchased the Products if she knew the representations were false and misleading or would have paid less for them.

130.   Plaintiff chose between Defendant's Products and other similar products which were represented similarly, but which did not misrepresent their attributes and/or lower-priced products which did not make the statements and claims made by Defendant.

131.   The Products were worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

132.   Plaintiff intends to, seeks to, and will purchase the Products again when she can do so with the assurance that the Products' representations are consistent with their composition.

133.   Plaintiff is unable to rely on the labeling of the Flying Embers, and other brands of hard seltzer and hard kombucha, which means she buys less of these.

134.   Plaintiff wants to resume purchasing these products, in moderation, knowing that she can rely on what the labels tell her, in the same amount as she previously did.

## Class Allegations

135.  Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Florida Class:** All persons in the State of Florida who purchased the Products during the statutes of limitations for each cause of action alleged.

> **Consumer Fraud Multi-State Class:** All persons in the States of Alabama, Alaska, Georgia, South Carolina, Tennessee, and Virginia, who purchased the Products during the statutes of limitations for each cause of action alleged.

136.  Common questions of law or fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

137.  Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

138.  Plaintiff is an adequate representative because her interests do not conflict with other members.

139.  No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

140.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

141.  Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

142.  Plaintiff seeks class-wide injunctive relief because the practices continue.

## Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*

### (Consumer Protection Statute)

143.  Plaintiff incorporates by reference all preceding paragraphs.

18

144.   Plaintiff and class members desired to purchase products that contained ingredients whose positive effects outweighed the negative effects from consuming alcohol.

145.   Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

146.   Defendant misrepresented the Products through statements, omissions, ambiguities, half-truths and/or actions.

147.   Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

148.   Defendant misrepresented the Products through statements, omissions, ambiguities, half-truths and/or actions.

149.   Plaintiff relied on the representations that the Products had antioxidants, probiotics, and adaptogens, and the widely-believed health properties of kombucha.

150.   Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u>

<u>(On Behalf of the Consumer Fraud Multi-State Class)</u>

151.   The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

152.   Defendant intended that Plaintiff and each of the other members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

153.   As a result of Defendant's use or employment of artifice, unfair or deceptive acts or business practices, Plaintiff, and each of the other members of the Consumer Fraud Multi-State

Class, have sustained damages in an amount to be proven at trial.

154.  In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

<u>Breaches of Express Warranty,</u>
<u>Implied Warranty of Merchantability/Fitness for a Particular Purpose and</u>
<u>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.</u>

155.  The Products were manufactured, identified, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that they contained ingredients whose positive effects outweighed the negative effects from consuming alcohol.

156.  Defendant directly marketed the Products to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and targeted digital advertising.

157.  Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

158.  Defendant's representations about the Products were conveyed in writing and promised they would be defect-free, and Plaintiff understood this meant that they contained ingredients whose positive effects outweighed the negative effects from consuming alcohol.

159.  Defendant's representations affirmed and promised that the Products contained ingredients whose positive effects outweighed the negative effects from consuming alcohol.

160.  Defendant described the Products so Plaintiff and consumers believed they contained ingredients whose positive effects outweighed the negative effects from consuming alcohol, which became part of the basis of the bargain that they would conform to their affirmations and promises.

161.  Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Products.

162.  This duty is based on Defendant's outsized role in the market as a trusted brand, as

described above, which means consumers expect it to be different than other companies without such a reputation.

163.   Defendant is a positive and consistent advocate for firefighters, as its name, Flying Embers, acknowledges the constant wildfires of California.

164.   Consumers expect a company that supports first responders so significantly will uphold a standard of honesty.

165.   Plaintiff recently became aware of Defendant's breach of the Products' warranties.

166.   Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

167.   Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Products.

168.   Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

169.   The Products did not conform to their affirmations of fact and promises due to Defendant's actions and were not merchantable because they were not fit to pass in the trade as advertised.

170.   The Products were not merchantable because they were not fit to pass in the trade as advertised, not fit for the ordinary purpose for which they were intended and did not conform to the promises or affirmations of fact made on the packaging, container, or label, because they were marketed as if they contained ingredients whose positive effects outweighed the negative effects from consuming alcohol.

171.   The Products were not merchantable because Defendant had reason to know the

particular purpose for which the Products were bought by Plaintiff, because she expected they contained ingredients whose positive effects outweighed the negative effects from consuming alcohol, and she relied on Defendant's skill and judgment to select or furnish such suitable products.

172.   Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

173.   Defendant had a duty to truthfully represent the Products, which it breached.

174.   This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, as a leading seller of alcoholic beverages, advertised as being "less bad" for you than standard alcoholic beverages, due to the addition of "good stuff," like antioxidants, probiotics, and adaptogens.

175.   Defendant's representations and omissions regarding the Products went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

176.   These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

177.   The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant, a leading innovator in the alcoholic beverage sector.

178.   Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Products.

179.   Plaintiff and class members would not have purchased the Products or paid as much

if the true facts had been known, suffering damages.

Fraud

180.   Defendant misrepresented and/or omitted the attributes and qualities of the Products, that they contained ingredients whose positive effects outweighed the negative effects from consuming alcohol.

181.   Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provide it with actual and/or constructive knowledge of the falsity of the representations.

182.   Defendant knew of the issues described here yet did not address them.

183.   Defendant's fraudulent intent is evinced by its knowledge that the Products were not consistent with their representations.

Unjust Enrichment

184.   Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1.   Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2.   Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3.   Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the

23

applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   August 15, 2022

Respectfully submitted,

/s/Will Wright
The Wright Law Office, P.A.
515 N Flagler Dr Ste P-300
West Palm Beach FL 33401
Tel: (561) 514-0904
willwright@wrightlawoffice.com

Sheehan & Associates, P.C.
Spencer Sheehan (*Pro Hac Vice* forthcoming)
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com